# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 02 2017, 9:24 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT - FATHER

Mark Small
Indianapolis, Indiana

ATTORNEY FOR APPELLANT - MOTHER

Brian A. Karle
Ball Eggleston, PC
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

Ic.G. and Ib.G. (Minor Children)

and

M.G. (Mother) and B.G. (Father),

*Appellants-Respondents,*

v.

March 2, 2017

Court of Appeals Case No.
54A04-1608-JT-1989

Appeal from the Montgomery Circuit Court

The Honorable Harry A. Siamas, Judge

Trial Court Cause Nos.
54C01-1601-JT-20
54C01-1601-JT-21

The Indiana Department of
Child Services,

*Appellee-Petitioner*

**Baker, Judge.**

[1]     M.G. (Mother) and B.G. (Father) appeal the trial court's order terminating their
relationship with their two children. Mother argues that the evidence does not
support the trial court's findings on her positive drug screens or that conditions
leading to the children's removal will not be remedied. Father argues that there
was insufficient evidence to support the termination order. Finding no error
and sufficient evidence, we affirm.

# Facts

[2]     Ic.G. was born to Mother and Father on November 11, 2008; Ib.G. was born to
Mother and Father on September 21, 2010.

[3]     On October 6, 2014, the Department of Child Services (DCS) visited the
family's home based on a report of guns, drugs, and paraphernalia being
present in the residence. The house contained bags of trash, mold-covered
food, cockroaches in the kitchen, dog feces on the floor, and paraphernalia.
The children were dirty and hungry from not having eaten that day. Ib.G. had

fleas in her hair, and Ic.G. had a cut on his leg covered by an old, dirty bandage. Mother and Father were arrested and incarcerated. On November 26, 2014, the trial court determined the children to be children in need of services (CHINS).

[4] Mother was incarcerated from October 6 through December 15, 2014. Father was in jail from October 6 through November 13, 2014. After a December 17, 2014, dispositional hearing, the court ordered Mother and Father to participate in individual therapy, home-based case management services, and a substance abuse assessment, provide drug screens, and have supervised visits with the children.

[5] Following Father's release from incarceration, family case manager (FCM) Charlene Colley could not find him until the dispositional hearing. Father participated in his substance abuse assessment and visitations. He continued to "sporadically" test positive for drugs, but he also tested negative at times. Tr. p. 152. He missed "maybe three" drug screens because of transportation issues. *Id.* at 155. On February 10, 2015, he started participating consistently in visitation with his children. On April 16, 2015, Father was arrested and incarcerated again based on a warrant for criminal activity that took place in July 2014. Father remains incarcerated; his earliest possible release date is 2021. While incarcerated, he is participating in a work program that may provide a six-month time cut to his sentence. He is also participating in the Father's Engagement program through which he is learning how to better interact with his children. Father has continued to see his children when

possible, has sent them letters and cards, and has spoken with them on the phone.

[6]    Following Mother's release, on December 30, 2014, FCM Colley told Mother that she would be contacted about beginning substance abuse treatment. On February 2, 2015, Mother completed an intake evaluation. On February 26, 2015, she started participating consistently in visitation with her children. She completed her substance abuse engagement group on March 30, 2015, and was referred to an advanced outpatient program. She was unable to complete the program, however, because she was arrested and incarcerated on April 16, 2015, based on a warrant for the same criminal activity as Father that took place in July 2014. She was released from jail on October 13, 2015.[1]

[7]    Shortly after her release, Mother went to see FCM Colley about restarting services. On October 27, 2015, she started group therapy with therapist Rachel Hamby; Mother attended consistently, and she was motivated and willing to participate. After completing the first part of group therapy, she moved on to relapse prevention, which she completed on February 16, 2016. During Mother's relapse prevention program, DCS reported to Therapist Hamby that Mother had relapsed, and Hamby recommended moving her from group therapy to intensive individual addictions treatment. Therapist Hamby and Anna Powers, Mother's individual therapist, both spoke with FCM Colley "due

_____

[1] We were subsequently informed that, after the termination hearing, Mother was sentenced to eight years probation.

to [Mother's] drug screens. *Id.* at 70. In addition to her group therapy, Mother saw Therapist Powers for individual therapy from September 18, 2015, through May 18, 2016, for substance abuse counseling and mental health concerns. Mother attended eighteen of her thirty-one scheduled appointments; she either cancelled or missed the other thirteen. As part of that intensive treatment, Therapist Powers told Mother that she preferred to see her twice a week to provide extra support; Mother said that she wanted to but "there was always something that just kind of came up." *Id.* at 76. Therapist Powers was aware of one relapse Mother had with Tramadol, a prescription drug for which Mother did not have a prescription; Mother also told Therapist Powers that she had tested positive for methamphetamine.

[8] On January 18, 2016, Mother secured and has maintained gainful employment. On May 20, 2016, Mother suggested to FCM Colley that she go to Half Way Home, a rehabilitation facility. Mother was accepted to the Half Way Home, but as of the time of the termination hearing, she had not entered the home. Mother told FCM Colley about her drug use "on every occasion" that FCM Colley and Mother met. *Id.* at 86. Mother admitted to FCM Colley that she used methamphetamine between March 30 and May 23, 2016.

[9] When Mother and Father were arrested on October 6, 2014, the children were removed and placed with their maternal grandmother. In December 2014, they were moved into foster care. They have both experienced difficulties since their removal and exhibited disruptive behaviors. Ib.G. would walk off with strangers, and Ic.G. was aggressive toward his foster siblings and dog. Ib.G.

was diagnosed with Disinhibited Social Engagement Disorder and Ic.G. was diagnosed with Conduct Disorder Childhood Onset based on destructive behaviors, hitting others, damaging property, and lying.

[10] On January 27, 2016, DCS filed its termination petitions. On August 25, 2016, the trial court granted DCS' petition for termination of parental rights of both Mother and Father. The court found that there was a reasonable probability that the conditions that resulted in the children's removal would not be remedied, noting that when the parents were in jail for extended periods of time after the children's removal, they were not able to participate in services or visit with their children during that time, and that even when Mother was not in jail, she failed to consistently participate in services or to refrain from using drugs. The court found that termination was in the best interests of the children because neither parent was in a better position to provide the children with appropriate care, supervision, or a safe, nurturing and stable home than they were at the beginning of DCS's involvement with the family. Mother and Father now separately appeal.

## Discussion and Decision

[11] Mother argues that the trial court erred by making findings of fact concerning her positive drug screens and by finding that there was a reasonable probability that the conditions that led to the children's removal would not be remedied. Father argues that there was insufficient evidence to support the termination order.

# I. Standard of Review

Our standard of review with respect to termination of parental rights proceedings is well established. In considering whether termination was appropriate, we neither reweigh the evidence nor assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We will consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's opportunity to judge witness credibility firsthand. *Id.* Where, as here, the trial court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous. *Id.* In making that determination, we must consider whether the evidence clearly and convincingly supports the findings, and the findings clearly and convincingly support the judgment. *Id.* at 1229–30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005).

Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31–34–21–5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1230.

# II. Termination Between Mother and Children

## A. Evidence of Drug Screens

[14] Mother argues that the trial court erred because it made findings of fact and conclusions concerning drug use by Mother even though DCS did not admit her drug screen test results into evidence at the termination hearing. She challenges the following factual findings:

- "Mother tested positive for methamphetamine, THC and heroin."
- "Mother continued to test positive for controlled substances on a regular basis in 2016, specifically Tramadol for which she did not have a prescription."
- "Mother tested positive for methamphetamine use in May, June and July 2016."
- "Mother tested positive for methamphetamine use on July 6, 2016."
- "[Mother] tested positive for methamphetamine use in May, June and July 2016 with her last positive screen for methamphetamine occurring just eight days before the Termination fact-finding hearing."

Appellant's App. Vol. II p. 42, 46. Mother argues that the evidence on which these findings was based was inadmissible because a proper foundation was not made; FCM Colley, who testified about Mother's drug screens, was not an expert witness qualified to testify about them; Mother did not have an opportunity to cross-examine an appropriate witness concerning the drug screens; and FCM Colley's testimony was inadmissible hearsay. Mother objected to this evidence, and the trial court sustained her objections.

During the termination hearing, Mother objected "to any testimony [the FCM] might give about positive tests. She can talk about what [Mother] told her, but . . . she's not able to testify about potential drug screens or lab tests." Tr. p. 86. However, Mother did not object to the following testimony, which was based on statements Mother made to FCM Colley, Therapist Hamby, and Therapist Powers:

- After the March 30, 2015, review hearing, the court found that Mother had not maintained her sobriety since her release from jail on December 15, 2014. The court's order was admitted into evidence at the termination hearing. DCS Ex. 7; Tr. p. 99-100.
- At the March 16, 2016, review hearing, the court found that Mother "continues to test positive for [T]ramadol without a prescription." The court's order was admitted into evidence at the termination hearing. DSC Ex. 10; Tr. p. 95.
- Therapist Hamby testified that DCS reported to her that Mother had relapsed. Therapist Hamby allowed her to complete relapse prevention in February 2016. *Id.* at 68-69.
- Therapist Hamby testified that she and Mother's individual counselor spoke with FCM Colley "due to her drug screens." *Id.* at 70.
- Therapist Powers testified that "there was one relapse I was aware of with the Tramadol," and that "I believe I was aware of another screen that came back another that she told me about another relapse that she had gotten I think she tested positive for meth." *Id.* at 75.
- Therapist Powers testified that Mother told her she had tested positive for methamphetamine, and that Therapist Powers discussed her positive test with her on May 13, 2016. *Id.*
- When asked what issues Mother identified for maintaining sobriety, Therapist Powers testified that "in terms of issues for maintaining sobriety I think a big one was just the addiction itself, just struggling . . . ." *Id.* at 76. Therapist Powers testified that "I think it was heroin that was her drug of choice." *Id.*

- FCM Colley testified that Mother told her about her drug use "on every occasion," and FCM Colley discussed Mother's drug use with her. *Id.* at 86.
- FCM Colley testified that after Mother was released from jail, "[s]he admitted to Tramadol use." *Id.* at 88. "She admitted to taking her mother's Tramadol and did not want [her FCM] to tell her mother." *Id.*
- During the time Mother was in substance abuse treatment, she admitted to FCM Colley that she was using drugs. *Id.* at 97.
- FCM Colley testified that Mother's use of Tramadol was concerning because she was taking someone else's prescription, and that even with help in place, "she still continues to use that's an issue as a drug addict, she is an addict." *Id.* at 100.
- FCM Colley testified that Mother admitted to FCM Colley to using methamphetamine between March 30 and May 23, 2016. *Id.* at 101.
- FCM Colley testified that because of Mother's continued drug use, DCS changed the permanency plan to termination of parental rights and adoption. *Id.*
- FCM Colley testified that on July 6, 2016, she had a discussion with Mother about her methamphetamine use. *Id.* at 105.
- FCM Colley testified that Mother "informed me she's getting some of the drugs from [her employer's] employees." *Id.* at 113.

[16]     Additionally, during the termination hearing, Mother testified as follows:

- When asked whether, in "the last couple of months," she has "admitted in that time that you have been struggling with methamphetamine since the beginning of May or so," she said "Yes ma'am." *Id.* at 64-65.
- She tested positive for Tramadol in either November or December. She was using Tramadol "[b]ecause of my teeth." *Id.* at 135-36.
- Her job "had me at south plant and that's where you don't want to be when it comes to drugs. I work at north plant regularly, there's no drugs there." *Id.* at 139. "They sent me over there [to the south plant] and it was a major trigger for me. I actually called my boss and told him you can't let me work here and he had me back at the north plant the next week." *Id.* at 144. She admitted to using methamphetamine when working at her job. *Id.*

[17]   We agree with Mother that the trial court erred when it based some of its findings on evidence for which it sustained Mother's objections. However, we find the error harmless because the specific findings of facts were used as examples to show that Mother continued to struggle with her addiction, including in the months leading up to the termination hearing—a struggle to which Mother, FCM Colley, Therapist Hamby, and Therapist Powers all testified without objection. The cumulative evidence outlined above provides a sufficient basis for the trial court's conclusions that Mother failed to overcome her drug addiction or maintain her sobriety. As a result, any error in the trial court's findings of fact was harmless.

## B.  Conditions That Led to Children's Removal

[18]   To determine whether the conditions that resulted in the children's removal will not be remedied, the trial court engages in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). The court first identifies the conditions that led to removal and then determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing any recent improvements against "habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.*

[19]   The children were removed as a result of the condition of Parents' home and substance abuse. Mother challenges the trial court's conclusion that "while

Mother did have stable employment for six months at the time of the fact-finding hearing, she still did not have independent housing so she was not able to show that she had acquired sufficient skills to provide the children with stable, clean, and safe living conditions." Mother's App. Vol. II p. 46.

[20] Mother first asserts that there was no evidence in the record to support the trial court's conclusion. Mother testified that "[m]e and my mother we don't get along very well, she's very negative with me." Tr. p. 139. FCM Colley testified that Mother "does not have stability, she doesn't even have her own place." *Id.* at 103. FCM Colley testified that in July 2016, "I found out [Mother] was staying with some guy. She was supposed to go [to the Half Way Home on] July first, she's staying with some guy I cannot say living because she swears she's not living with him." *Id.* at 104-05. FCM Colley also testified that "I don't believe she's living in the same place sir, but I can't testify to that as to why." *Id.* at 113. This evidence supports the trial court's conclusion.

[21] Mother also contends that it was inappropriate for the trial court to require a parent to obtain "independent housing" to avoid termination of parental rights. The trial court did not require her to obtain independent housing, but rather considered her unstable housing situation as one factor in determining whether she could provide stability to her children. The trial court concluded that Mother "has not been able to demonstrate sufficient progress toward the goal of reuniting with her children: she has not maintained her sobriety, she has not participated in services consistently to make progress on parenting skills or independent living." Mother's App. Vol. II p. 46. In *Bester v. Lake County Office*

*of Family and Children*, 839 N.E.2d 143, 150-51 (Ind. 2005), our Supreme Court found that, although the father did not establish himself as independent or obtain his own residence, there was no causal connection between his living arrangements and any adverse impact those arrangements may have had on his child. Here, however, because the trial court was able to consider testimony that questioned where Mother was actually living, as well as her ongoing substance abuse, its conclusion supported a reasonable inference that her living arrangement could pose a threat to the well-being of her children and that there was a reasonable probability that it would not be remedied.

[22] As for Mother's substance abuse, Mother states that she understands that she is suffering from addiction and "wants to do whatever work is necessary to cope with her addiction." Mother's Br. p. 16. She concedes that her children should not have been in her custody at the time of the termination hearing. Mother's Br. p. 17. It is well established that "the trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Bester*, 839 N.E.2d at 152. The "trial court should judge a parent's fitness to care for his child as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.*

[23] We recognize that Mother loves her children and has not missed any visits with them. We laud her for recognizing that she has a problem with addiction and for working to overcome that addiction. However, her acknowledgement of the problem does not negate the fact that since her release from jail, she has

continued a pattern of substance abuse, despite the availability of multiple services to aid her in her struggle. She admitted that she has struggled with her addiction to methamphetamine and used Tramadol. At least at one point, her job "was a major trigger" for her. Tr. p. 139. Considering her habitual pattern of substance abuse, and the fact that she was using drugs in the months leading up to the termination hearing, the trial court did not err when finding that there was a reasonable probability that this condition, which led to the children's removal, would not be remedied.

## C. Best Interests of the Children

[24] Mother also challenges the trial court's conclusion that termination was in the Children's best interests. Clear and convincing evidence does not need to show that "the continued custody of the parents is wholly inadequate for the child's very survival." *Bester*, 839 N.E.2d at 148 (quotation marks and citation omitted). Instead, it is sufficient for the clear and convincing evidence to show that "the child's emotional and physical development are threatened by the respondent parent's custody." *Id.*

[25] FCM Colley testified that adoption was in the children's best interests because they needed to be in a "drug free, stable and structured home environment for them where their needs are met." Tr. p. 109. FCM Colley also testified that "they need someone that can devote that time to them that's not going to be a drug addict and they don't have to be scared that their needs aren't going to be

met." *Id.* The children's court appointed special advocate also recommended that Parents' parental rights be terminated.

[26] Mother cites her positive relationship and consistent visits with her children, her steady job and home, and her good faith efforts to participate in all reunification services. Mother testified that "I've made my fair share of mistakes and I will have a hard time forgiving myself for them, but I can do this I know I can. I think I just need a little more stability and a little more positivity in my life." *Id.* at 144. Mother conceded that she struggles with addiction, promised that she will work to cope with her addiction, and said that "she demonstrated a willingness and an ability to improve and do what is necessary to eventually get her children back. Mother does not contend that the children should have been in her custody at the time of the fact-finding hearing." Mother's Br. p. 17.

[27] The trial court recognized Mother's love for her children and her consistent visits with them but also that Mother was not in a better position to provide her children with the appropriate care, supervision or home than she was nearly two years earlier when DCS first became involved with the family. Mother's testimony and argument on appeal suggests that she also recognizes that she is not prepared to provide her children with the stability and substance-free environment that they need. It is unclear if Mother will ever be prepared to provide for them. Accordingly, we find that the evidence supports the trial court's conclusion that termination is in the children's best interests.

# III. Termination Between Father and Children

[28] Father does not specifically challenge any of the elements that DCS is required to prove to effectuate a termination, but rather claims generally that there was insufficient evidence to support the termination order. We infer from his argument that he intended to focus on two statutory elements: the children's best interests and DCS's plan for the children's care and treatment.

## A. Best Interests of the Children

[29] In challenging the termination, Father relies on the fact that no evidence was presented at the termination hearing that Father was convicted of any charge arising from his arrest on October 6, 2014, when the children were moved from his home. Father was initially arrested on October 6, 2014, based on a report of guns, drugs, and paraphernalia being present in the family's home. He was released on November 13, 2014. Immediately following his release, FCM Colley could not locate him for over a month until he attended the dispositional hearing on December 17, 2014. Father participated in substance abuse assessment, during which he "sporadically" tested positive for drugs and on at least several occasions missed his drug screens. Tr. p. 152. Starting February 10, 2015, three months after his release, he participated in visitations with his children. His visits stopped when he was arrested and incarcerated on April 16, 2015, based on criminal activity from July 2014; he will remain incarcerated until 2021 if he does not receive any time cuts to his sentence.

[30] After Father was released, he tested positive for drugs and missed some of his drug screens. When asked whether he thinks he needs help handling his substance abuse, he said, "Oh yeah, there's no question about it." *Id.* at 157. He conceded that he needs classes that involve "teaching me how to stay sober, how better to keep myself strong enough to stay sober, how to correctly love my children and provide for them, to be the strong father and man that they need me to be." *Id.* This testimony supports the trial court's finding that, nearly two years later, Father is not in a better position to provide his children with appropriate care and housing than he was when DCS first became involved with the family.

[31] This evidence is sufficient to support the trial court's conclusion that termination is in the children's best interests. We cannot say that the trial court erred in determining that this element required for termination was met.

## B. Satisfactory Plan for the Care and Treatment of the Children

[32] Father also seems to challenge whether there is a satisfactory plan for the care and treatment of his children. Beginning in January 2016 and through the time of the termination hearing, the children were living with a foster family. In January, Ib.G. was anxious and she would throw fits; Ic.G. would get upset with his foster family. Both children improved during their time with their foster family and have developed routines. The foster mother testified that she and her husband were willing to adopt the children.

[33] Parents want their children in a relative's home, and FCM Colley testified that, at Father's request, she was going to evaluate Father's sister and another relative to determine whether they could adopt the children. At the time of the termination hearing, FCM Colley did not yet have contact information for Father's relatives. Although DCS was still exploring different options for the children's placement, its plan was for the children to be adopted. Adoption is a "satisfactory plan" for the care and treatment of children under the termination of parental rights statute. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009). Therefore, Father's implication that the trial court erred by not considering whether there was a satisfactory plan for the care and treatment of his children fails.

[34] The judgment of the trial court is affirmed.

Mathias, J., and Pyle, J., concur.